# FEDERAL LAND BANK OF BALTIMORE *v.* ANTONIO COSIMANO.

## [No. 1, October Term, 1933.]

334

*Decided November 8th, 1933.*

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*I. P. Whitehead* and *William Beasley,* for the appellant.

*Ogle Marbury,* with whom was *Robert F. Leach, Jr.,* on the brief, for the appellee.

ADKINS, J., delivered the opinion of the Court.

This suit grew out of a dispute as to the appropriation of the proceeds of a fire insurance policy.

The appellee held a mortgage of $2,000 on the property of Anthony and Hugo Battistone, subject to a prior mortgage of $5,000. On September 2nd, 1925, they executed a mortgage to appellant to secure a loan of $6,000, out of which the $5,000 was paid, and appellee waived his lien in favor of the mortgage of appellant on being paid the sum of $438.72. Appellee made another loan and took an additional mortgage, the balance of his $2,000 and the new loan making in all an indebtedness of $2,200, both of his mortgages being subject to the appellant's mortgage. Subsequently Hugo, alone, became the owner of the equity of redemption. Appellant's mortgage contained a covenant by the mortgagors to keep the improvements on the property insured to the amount of at least $3,400, and to cause the

policy to be so indorsed as in case of fire to inure to the benefit of the mortgagee. The blank forms of the covenant for insurance in appellee's mortgages were left blank, in the first entirely, and in the second as to the amount, so that there is no apparent covenant for insurance in either of them.

At the time of the execution of appellant's mortgage, the mortgagors had a policy of insurance on the house, which was subsequently burned, of $4,000, and that policy was indorsed and made payable in case of fire to the mortgagee as its interest might appear. This policy was delivered to the appellant. Subsequently, without the knowledge of appellant, the mortgagors took out an additional policy on the house of $2,000, and had it similarly indorsed for the benefit of the appellant as mortgagee. The house was destroyed by fire, and the loss was found to be $5,857.50. On being informed of the fire, appellant, through Wm. H. Shaeffer, chief of appellant's insurance division, wrote the fire insurance company: "The check in settlement of this loss is to be made payable jointly to the order of the assureds and the Federal Land Bank of Baltimore. Kindly mail it direct to the assureds. * * * They will forward it to us after making the proper endorsements." But by request of Mr. Frank M. Stephen, attorney for the mortgagors, one check for the loss on the house was made out to the appellant, and a check for the loss on personal property in the name of the mortgagors, and the first mentioned check was mailed by Mr. Stephen to appellant in a letter dated December 23rd, 1930, he having inadvertently omitted to inclose it in a letter of the previous day, in which the writer said the mortgagors would like to have $3,000 of the loan remain on the farm, and requested appellant to have appellant's appraiser look over the farm, and further requested appellant to advise "what application, if any, is necessary to be made by Mr. Battistone and his son to accomplish the above." There had been previous correspondence between appellant and Mr. Stephen. In a letter of November 24th, 1930, he wrote, in reply to a letter inquiring about an overdue amortization payment, that the matter of the adjustment of the fire loss had been placed

in his hands by the mortgagors, "and out of the proceeds of the settlement when made the entire amount due your bank will be paid." And on December 12th, 1930, he wrote that he had arrived at a settlement of the insurance, "and Mr. Battistone says that he would like to know how much of the loan could remain on the farm in its present condition because he says that he still has a tenant on the property, residing in the tenement house on the property, and he still has a stable and other outbuildings and that more land is now cleared than when the loan was made. Without binding the bank could you ascertain for me what you think the bank would allow to remain on the property in its present condition? I think Mr. Battistone would like to let three thousand of the loan remain if possible. Also let me know the exact procedure you wish to follow in the event he wants part of the loan to remain on the property." In reply to this letter Wm. H. Shaeffer wrote: "In regard to that portion of your letter dated December 12th pertaining to the above fire loss, the use of proceeds derived from the destruction of building items must be used for either rebuilding or curtailment of the loan by applying prepayments against the principal sum of the mortgage. Permission must first be obtained from this bank when it is desired to use the funds for rebuilding."

Subsequently, on December 30th, 1930, in answer to Stephen's letters transmitting the check of the insurance company, Shaeffer wrote acknowledging receipt of the check, and added: "We note it is the borrower's desire to reduce the amount of his loan to $3,000.00 to commensurate for the reduction in security through the loss of the dwelling, and the excess of the insurance proceeds after making the curtailment on the loan is to be returned for Mr. Battistone's individual use. The appraiser will re-examine the farm within a few days to give his recommendation concerning the advisability of this plan and when this report is in hand we will write you further on the subject." And on January 12th, 1931, he wrote: "The bank has considered the request recently made for the release of insurance pro-

ceeds derived from the loss of the main dwelling on this farm. This is to advise we will permit sufficient amount to be withdrawn to pay the past due semi-annual installment and use $3,200.00 to apply against reducing the principal sum of the mortgage debt. The remaining amount will be withheld to pay bills in connection with a bungalow the borrower plans to erect." To which letter Mr. Stephen replied on January 16th, 1931, that Battistone was willing to have the bank apply $3,200 against the principal of the mortgage debt, and sufficient to pay the amortization payment, "provided the bank will release to him the balance of the proceeds derived from the loss on the main dwelling. He wants to apply this money at this time to the second mortgage and build the bungalow out of his own funds at his convenience. * * * I am asking that you kindly have your executive committee give Mr. Battistone's request careful consideration and see if they can't grant his request if the Bank is not prohibited by its rules from doing so. I presume Mr. Battistone will be perfectly willing to have the bank apply the money if released direct to the second mortgage if the bank would prefer to do that. If the bank refuses Mr. Battistone's request he will be very much displeased and will, I think, pay off the entire loan and no doubt will feel, and probably state, that the bank has not taken any steps, as he sees it, to help farmers. Kindly let me hear from you as soon as you can in reference to this matter, and when you write kindly send me statement showing the exact amount that Mr. Battistone owes and what, if anything, will be returned to him if he pays the loan in full, and if his request is granted how much in that event will also be returned to him."

On January 22nd, 1931, Stephen wrote that Battistone had asked if the bank would release the balance after applying the $3,200 to the principal of its mortgage. To which letter Shaeffer replied on January 23rd, 1931, that the executive committee had considered the recent request and had approved the following distribution:

$195.00 September installment
3,040.54 Additional installments Nos. 11 to 52, in-
    clusive
 122.96 Interest from date of last installment
2,499.00 To be returned to the borrower
_____

$5,857.50

And he inclosed a check for the $2,499 to the father of the mortgagor. A few days later Shaeffer wrote that the bank had made an error of $57.96, and held that additional amount to the credit of Battistone. A statement filed as an exhibit in the case shows that after this adjustment the balance of mortgage of appellant was $2,619.49.

The bill of complaint filed in this case by the appellee prayed (1) that a decree be passed declaring defendant's mortgage to be subsequent to plaintiff's mortgage; (2) that defendant be enjoined from foreclosing its mortgage, except subject to the liens of plaintiff's mortgages; (3) for general relief. The defendant answered, and a good deal of testimony was taken, and by agreement of all parties in interest the chancellor, by decree of August 18th, 1931, appointed Messrs. Charles W. Held and Ogle Marbury as trustees to make sale of the property given as security in the respective mortgages, and directed that the money arising from said sale be brought into court to be distributed under the direction of the court. The report of sale by the said trustees, filed on August 16th, 1932, in which the appellant was named as the purchaser at $2,800, was ratified and confirmed. The auditor's report, after deducting expenses amounting to $721.03, shows a balance in the hands of the trustees of $2,078.97. On February 7th, 1933, the court decreed that the said trustees pay to the plaintiff said balance of $2,078.97. This appeal is from that decree.

The decree was based on the theory that the mortgage of the appellant was paid off by its receipt and acceptance of the insurance money, and that appellee's mortgages moved up to first place. It is admitted that the amount of the check

of the insurance company to appellant was more than the balance of its mortgage at that time.

It is argued on behalf of appellee that, assuming there were no contractual relations between the appellee and the insurance company or the appellant, and no covenants in appellee's mortgages which would give him an equitable lien on policies taken out by the mortgagors for their own benefit, yet, on the principle that all parties in privity of title have a right to disengage the property of all prior incumbrances, the senior mortgagee, on receiving a sufficient amount from insurance policies taken out for its benefit and as additional collateral security, was obliged to apply it to the payment of its mortgage; and the case of *Connecticut Mutual Life Ins. Co. v. Scammon,* 117 U. S. 634, 6 S. Ct. 889, 29 L. Ed. 1007, is cited in support of that contention. That case, however, is distinguishable because of the covenant in the mortgage which protected the complainant.

But whether the argument be sound or not, in any event it is true that, if the appellant was entitled to be paid the proceeds of the insurance policies by reason of the covenant in its mortgage and the indorsement on the policies, or the payment was voluntarily made at the instance of the mortgagors, and if, in either case, the payment was accepted by appellant solely for its own account, that in law extinguished the mortgage, and it could not be revived so as to keep its place as a senior lien, by any subsequent arrangement with the mortgagor. So it becomes necessary to consider the contentions of appellant: (1) That appellant could demand payment of only $3,400, that being the amount of insurance required by its mortgage; (2) that the payment of the entire amount of the loss to appellant was with the understanding that part of the check should be paid over to the mortgagor.

We do not find the first contention valid. The covenant in the mortgage was to insure for at least $3,400, and to have the policy so framed or indorsed, as in the case of fire, to inure to the benefit of the mortgagee. It seems to us clear that it was the intent of the parties that the improvements should be insured for at least $3,400, and that whatever

insurance was taken out should be made payable to the mortgagee to the extent of its interest. 1 *Jones on Mortgages* (7th Ed.), sec. 400; *Reid v. McCrum*, 91 N. Y. 412 (in which the policies were taken out without the knowledge of the mortgagee); *American Ice Co. v. Eastern Trust Co.*, 188 U. S. 626, 23 S. Ct. 432, 47 L. Ed. 623. We have found no authority for the proposition that the right of the mortgagee is limited to the minimum amount mentioned in the covenants, where policies for a greater amount are assigned or made payable to him. The cases cited by appellant deal with the failure of the mortgagor to have the policies taken out by him made payable to the mortgagee, when an equitable lien in favor of the mortgagee arises, by reason of the covenant in the mortgage, for the amount mentioned in the covenant. But, even if the first contention could be sustained, the second, we think, is not supported by the evidence. In our opinion, the chancellor was warranted in finding that the payment of the entire amount of the loss to the mortgagee was made and accepted unconditionally. There had been a default, and by the terms of the mortgage the entire debt became due at the option of the mortgagee. It was also provided that after three years the mortgagors might pay off the entire debt at their option, and this time had expired.

At the request of the attorney and agent of the mortgagor, the check was drawn by the insurance company to the order of the mortgagee, and was forwarded to it by said agent. It is not claimed that the agent was not duly authorized. Indeed, the testimony of the mortgagor and his father shows that they regarded this check as payment of appellant's mortgage. And the check was sent without claiming the right to the return of any part of it, although the company had notified the attorney that the insurance money would have to be applied to the mortgage debt or to rebuilding. It is true that in sending the check the attorney wrote that the mortgagor would like to have $3,000 of the loan remain on the farm; but this was a request and not a demand. It appears from the correspondence that the attorney and his

client recognized that granting of the request was optional with the appellant, and depended upon future negotiation and investigation.

Our conclusion is that the acceptance by appellant of the check for more than the amount of the then existing debt must be regarded as a discharge of its mortgage, and that it could not revive the mortgage, as against the appellee's junior lien, by the subsequent negotiations resulting in the return to the mortgagor's father of part of the payment which had been accepted. In *Frontier Mortgage Corporation v. Heft*, 146 Md. 1, 125 A. 772, an insurance company which paid the proceeds of its policy to the mortgagee successfully sought to be subrogated to the claim of the mortgagee against the mortgagor on the ground that, while under the terms of the policy it was liable to the mortgagee, it was not liable to the mortgagor by reason of a forfeiture on his part. The issue, therefore, in that case was different. But it announced the principle (held not applicable to the facts of that case) that payment by the insurer to the mortgagee, when the policy was taken out by the mortgagor and assigned to the mortgagee for the purpose of better securing the mortgage debt, is for and on behalf of the mortgagor, and discharges the mortgage debt in whole or *pro tanto*, depending upon the amount of the insurance.

*Decree affirmed, with costs to the appellee.*