COTTMAN COMPANY *v.* CONTINENTAL TRUST COMPANY

[No. 80, October Term, 1935.]

*Decided January 16th, 1936.*

The cause was argued before BOND, C. J., URNER, OF-FUTT, PARKE, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Thomas F. Cadwalader* and *William Lee Rawls*, with whom was *Jesse Slingluff* on the brief, for the appellant.

*Edward Duffy*, for the appellee.

MITCHELL, J., delivered the opinion of the Court.

The Cottman Company, a Maryland corporation, engaged in the tugboat business, on October 15th, 1922, issued a number of ten-year seven per cent. sinking fund convertible debentures, which accordingly matured on October 15th, 1932. Upon the date of maturity, there remained outstanding $43,000 of the original indebtedness. The company at that time did not have the money with which to redeem these bonds; whereupon negotiations took place among the representatives of the bondholders, the Cottman Company, and the Continental Trust Company, the original trustee under the debenture agreement, by virtue of which the consent of the bondholders to the extension of the maturity of said bonds for an additional period of five years was obtained; it being provided, however, that security for the bonds be given the trustee in the form of a mortgage on a fleet of nine tugboats then belonging to the appellant, and that the entire debt be amortized by payment of $8,000 on April 1st, 1935, and $7,000 every six months thereafter until the maturity of the extended bonds, the bonds to continue to bear their original interest of seven per cent. The extension agreement provided that the mortgage on the tugboats should be executed by the appellant to the Continental Trust Company. In the agreement, however, no provision was made for insuring the tugboats upon which the mortgage was to be given. Provision was made for the sale of a portion of the fleet, under certain conditions, with the written approval of the holders of fifty per cent. of the outstanding bonds, or with the approval of certain named persons, the net proceeds of any sale to be applied to the sinking fund. While, as hereinbefore indicated, the agreement did not provide for insurance upon the tugboats, it appears, nevertheless, that the mortgage did provide for such insurance, and that the policies, "properly endorsed so as to protect the interest of the mortgagee or trustee," be delivered to the trustee.

There has been no total destruction of any of the tugs, but during the years 1933 and 1934 three of the tugs

were damaged, and, according to the usual course, these tugs were sent to shipyards for repairs, after surveys and estimates made by the owners and underwriters. The Cottman Company paid the full amount of the repair bills; and the insurance company, in accordance with the terms of the policy, issued checks for the several losses occurring, in the aggregate sum of $4,074.74, which checks were made payable to the trustee, and represented the actual cost of the repairs, to wit, $6,066, less deductions for reinstatement premiums and certain other deductions designated as "deductible averages." The reinstatement premiums so deducted, amounting to $188.26, were reimbursed by the appellant to the trustee; so that the trustee now holds $4,263 as proceeds of the insurance policies.

The Cottman Company, having caused the aforegoing repairs to be made, and having paid for the same, afterwards requested the trustee to pay over to it the amount of the insurance money so held. This request was refused by the trustee; and on October 16th, 1934, the Cottman Company filed a bill against the trustee in the Circuit Court of Baltimore City, setting forth in substance the compliance with the extension agreement, through the execution of the mortgage; that under the terms of the mortgage, the company was required to insure the property covered by it; that all of the terms of said mortgage had been complied with; that the several damages hereinbefore indicated had been sustained by the company; and that the damaged tugs had been fully repaired and restored to their former seaworthy condition, and bills for such repairs fully paid by the company. It is alleged in the bill that the Cottman Company has no means of knowing the names of the present *cestuis que trustent,* because the bonds held by them are made payable to bearer, and transferable by delivery only, and that the trustee fully represents the interest of the holders of said bonds in the premises. Finally, the bill prays the court to assume jurisdiction in the premises, and construe the mortgage, and direct the mortgagee, the trustee there-

under, in the execution of its duties to its *cestuis que trustent,* to refund and pay over to the company the amount of the insurance money then held, upon due proof of the completion of the repairs and payment therefor.

On November 19th, 1934, the defendant trustee filed its answer, in which it admits the receipt of the insurance money, and sets forth that, while the mortgage provided for insurance upon the mortgaged property, it did not provide for the application of the proceeds of such insurance. The answer then states: "This defendant has never had any concern as to the ability of the Cottman Company to repair any damage to the mortgaged property, but it has had concern as to whether or not the Cottman Company would be enabled to pay said sinking fund bonds at their present maturity, and as to whether the proceeds of the mortgaged property on foreclosure and sale would pay said bonds; that it is mere speculation as to whether said bondholders would be in a better position by the retention by this defendant of said insurance moneys, or by the payment of said insurance moneys to the complainant after repairs have been made, but it is certain that at the present time the said bondholders are in a better position and have better security for the payment of their bonds than they would be, had this defendant paid said insurance moneys to the complainant." Further, the answer sets forth that the defendant has been advised that the complainant is not entitled to be paid said insurance money, unless the trustee is directed to pay the same by a court of chancery in a proper proceeding. The answer submits that the complainant had means of knowing the names of the bondholders secured by the mortgage, notwithstanding that said bonds are payable to bearer, and that the complainant, at the time of filing the bill of complaint, knew or could easily have ascertained the names of such bondholders; and denies that it fully represents the interests of the holders of said bonds for the purpose of the determination of the issues involved.

Paragraph 6 of the answer is as follows: "And further answering the allegations of said bill of complaint, this

defendant says that admitting all of said allegations to be true, the said bill of complaint does not state sufficient facts to constitute a cause of action against this defendant, firstly, because while this Court has jurisdiction to construe said ship mortgage when the proper parties are before it, yet the true construction of said ship mortgage should be against the claim of the complainant, even though said vessels have been fully repaired and restored to their former seaworthy condition, and secondly, because the proper parties are not before this court, in that the whole or a representative number of said bondholders are not parties to this proceeding."

On June 24th, 1935, the chancellor passed the decree from which this appeal is taken, as follows: "This case coming on to be heard on the bill, exhibits and answer, and particularly paragraph 6 of said answer, and having been fully argued by counsel, and the complainant having been granted leave to amend by making a representative number of bondholders parties, and the time for amendment having expired and no amendment having been made, it is therefore, adjudged, ordered and decreed that said bill of complaint be and the same is hereby dismissed, with costs to defendant."

It will be observed that the two questions involved in this case are: (a) What disposition should be made of the money received by the trustee, under the circumstances of this case? (b) Are the bondholders, or any number of them, necessary parties to this suit?

The case was heard below on bill, answer, and exhibits; and it would appear from the decree that the question was submitted chiefly on the issues raised in paragraph 6 of the answer. In that aspect, the allegations of fact in the bill may be treated as conceded; and we have a situation wherein a mortgagee of certain boats, being also a trustee whose *cestuis que trustent* are holders of bonds issued by the boat owner, has received money from an insurance company under a policy issued to the mortgagor (with loss payable to the mortgagee), which money was paid to the trustee after the mortgagor had paid

for repairs to damaged boats covered by the mortgage, the amount of insurance money being equal to the repair bills, less certain permissible deductions, and the mortgage being silent as to the application of any insurance proceeds. The mortgagor demands from the trustee reimbursement for the cost of repairs to the extent of the amount received by it from the insurance company. The trustee refuses to pay over this money, claiming the right to hold it as a part of the sinking fund for the retirement of the outstanding bonds, alleging that by this course the bondholders are in a better position, with respect to security for the bonds, than if it complied with the request of the mortgagor. There is no evidence of default, nor of impairment of the security.

The general rule is that where property is insured under these circumstances, and a total loss occurs, the mortgagee is entitled to retain the insurance proceeds, and apply the same to the extinguishment of any then existing overdue indebtedness, or to future installments as they become due.

In *Thorp v. Croto,* 79 Vt. 390, 65 A. 562, Judge Miles, after delivering the opinion on behalf of the majority of the court, filed a vigorous dissenting opinion, wherein the subject is exhaustively covered, and cases in various jurisdictions analyzed.

Almost invariably, the reported cases involve controversies arising after a complete destruction of the security insured, with no suggestion of an attempted restoration of the property destroyed, by the use of the insurance money. In such event, the property insured being pledged as security for the debt, and the insurance being provided in order to protect the security, upon a failure of the security by reason of annihilation, the logical consequence is a conversion of the security from property into money, thereby achieving the object and purpose of insurance protection.

Few cases, apparently, have reached appellate courts where the use of the insurance money for the repair and restoration of the security has been combatted by the

recipient mortgagee. In such cases the argument is made that by virtue of the replacement or restoration, the creditor is left in the same position as he was before the loss, and therefore has no ground of complaint. It cannot be denied that if the restoration of the security, at the expense of the debtor, to the value it had before the loss or damage, leaves the parties *in statu quo*, then the retention of the insurance money by the creditor, mortgagee, or trustee, as additional security, would put the holder in a better position than he had originally bargained for. The theory of insurance, however, does not contemplate a resulting profit to the insured, or his mortgagee or other creditor. The interest of the mortgagee is to maintain the equilibrium of debt and security; and if, by the application of the insurance money to the upkeep of the security, that parity would be continued, it is not inequitable to require the payee of the fund to transfer the same to the debtor for that purpose, upon properly safeguarding its application to that end.

In cases where the repair or restoration of the security has been primarily effected by the mortgagor, at his own expense, to deny the transfer to him of the insurance fund (the payment of which to the mortgagee, in the first instance, was based upon the happening of the damage) might conceivably have a detrimental influence upon the conduct of his business, by reason of his being compelled to bear the total cost, and a corresponding decline in his ability to meet future payments, which financial depreciation would, in turn, be reflected in the value of the security. Therefore, where there is no default, and the security has been restored, the condition of the parties being substantially the same, not only would there be no harm done to the mortgagee by a transfer of the fund to the mortgagor, but a positive detriment to the mortgagee, as well as to the mortgagor, might follow a retention of the same, depending upon the magnitude of the burden of repair or restoration borne by the mortgagor.

In *Fergus v. Wilmarth*, 117 Ill. 542, 7 N.E. 508, where

the Chicago fire of 1871 destroyed the buildings of Fergus, which, with the land whereon they stood, had been security for his debt to Wilmarth, and the insurance money was paid into the hands of a trustee, Justice Magruder said: "After the collection of the insurance money by the trustee, the question arose what he should do with it. He was the agent of both the mortgagor and the holder of the note. The money took the place of the buildings destroyed by the fire and was, in his hands, a part of the security for the debt. The creditor, Wilmarth, desired to have the money credited upon the indebtedness, but Fergus was unwilling to have such application made of it. As the principal was not yet due, and no default had been made in the payment of interest, the trustee could not apply the fund to the reduction of the debt without the consent of Fergus. Fergus wished that the money should be paid over to him, to be used in the construction of a new building upon the lot. It would not have been right for the trustee to have turned over to the mortgagor either the whole amount at once, or different portions of such amount at different times, unless its application to the erection of a new building, and thereby a consequent increase in the value of the security [i. e., from land without buildings to improved real estate] would have been, in some way, made certain. If Fergus had received the insurance money, and had appropriated it to some other purpose, neglecting to improve the lot at all, the creditor would have had reason to complain of the trustee."

"The purpose of the parties in creating the insurance out of which this fund arose was attained by a restoration of the house, thereby placing them in the same situation they were in before the fire." *Naquin v. Texas Savings etc. Assn.*, 95 Tex. 313, 67 S.W. 85, 86.

In the case before us, the repairs have been made and paid for by the mortgagor; and the only duty of the mortgagee, before paying over the insurance money by way of reimbursement on the demand of the mortgagor, is to assure itself that the repairs have, in fact, been com-

pleted and the bills therefor paid, in order to safeguard the interest of the bondholders for whom it acts as trustee.

Taking up the second question presented by this appeal, as a general principle trustees do not represent their *cestuis que trustent* in suits respecting the trust property; and beneficiaries, as well as trustees, are necessary parties to a suit. *Phelps, Judical Equity*, sec. 30; *Hawkins v. Chapman*, 36 Md. 83. An exception to that rule, however, is found in cases in which a trustee has full powers of sale and receipt. In such cases, by special statute in this state, trustees represent their beneficiaries, who may be made parties upon application. Code, art. 16, sec. 197. In *Miller's Equity Procedure*, sec. 35, it is said: "If the powers and duties of a trustee are such as to constitute him the representative of the beneficiaries, the latter are not necessary parties to an action by or against him in relation to the trust estate. Whether in a given case a trustee is such a representative is to be determined from a consideration of the instrument by which, and the purposes for which, he was appointed."

The question now before us is not whether the bondholders, or some of them, in the instant case, would be proper parties, but whether they are necessary parties. Or, in other words, would direct, in addition to constructive, jurisdiction over them, in any manner cause the chancellor to decree differently? The original agreement of extension for the payment of the bonds, which was entered into by and between the appellant (company), the appellee (trustee), and the bondholders, among other matters provides: "Whereas the company has offered to the bondholders, provided they deposit their bonds with the trustee and execute this agreement extending the maturity of their bonds by permitting the same to be stamped as hereinafter provided, to secure the said bonds, both as to principal and interest, by a mortgage to the trustee on the following nine tug boats now owned by the company, to wit: * * * Said mortgage shall contain such provisions as may be agreed upon by the company

and the trustee, but shall contain a covenant by the company to pay said bonds on October 15, 1937."

It is a significant fact that the agreement of extension does not make the insurance of the tugs, and the indorsement of such policy to the trustee for the protection of the bondholders, a condition precedent of the then contemplated mortgage. In consequence, authority for the presence of the insurance clause in the mortgage may be classified as among "such provisions as may be agreed upon by the company and the trustee." The trustee, and the attorneys designated by the agreement to prepare the mortgage, are to be commended for their prudence in causing a provision to be embodied in the mortgage, the purpose of which was to protect the bondholders against either marine or fire loss. But in so far as the authority under which they acted was concerned, namely, the assent of the bondholders, such a provision was not mandatory, and the insurance policies procured by the mortgagor and indorsed and delivered to the trustee, according to the express terms of the mortgage were indorsed and delivered "so as to protect the interest of the mortgagee or trustee."

Under the facts in this case, the mortgage being silent as to the disposition of any insurance money collected by the trustee, the query arises: What is necessary to be done "so as to protect the interest of the mortgagee or trustee?" And the answer to this question must be reached through a careful investigation of the circumstances under which the agreement and mortgage were executed. It is shown by the record that the bonds were in default; and the appellant sought and secured an extension of time for their payment. An agreement and mortgage resulted from these negotiations, and, as has been noted, provision is made for the payment of seven per cent. interest on the indebtedness, and for the creation of a substantial sinking fund. It is obvious that the company must function in order to meet these requirements, and that it could not have been intended, or even contemplated, that it could successfully meet the

obligations of its contract unless it could continue its operations. If, therefore, one or more of its fleet of tugs became damaged, the insurance money accruing from the loss could at once become the fund from which the repairs would be made and the tug put back in commission. Such, we think, was the intention of the parites, because, from the viewpoint of both the company and the bondholders, it was essential that the company operate its business in order to meet its obligations. Any other construction, in our opinion, would place the bondholders and their trustee in the inconsistent position of causing financial stress to the same obligor from which they seek ultimately to collect their indebtedness.

The common interest of all concerned, the bondholders, the trustee, and the tugboat company, was the successful operation of the business, the coincident value of the bonds, and their ultimate redemption. The question in litigation was a single one, the disposition of the insurance money; and there were but two courses open before the chancellor: To direct its transfer to the mortgagor, or to permit its retention by the trustee as additional security. The mortgagor and the trustee, respectively, represented these conflicting views, either of which could have been held by the bondholders, or a number of them. Whichever position they may have taken in the controversy was represented by one or the other of the actual parties to the suit. In this connection we quote from *Sweet v. Parker*, 22 N.J.Eq. 453, 455: "Many exceptions exist to the general rule that in equity all must be parties who have an interest in the object of the suit. The reason or principle of such exceptions is stated as follows in *Calvert on Parties*, sec. 2, p. 20; 'If they are required to be parties merely as the owners and protectors of a certain interest, then the proceedings may take place with an equal prospect of justice if that interest receives an effective protection from others. It is the interest which the court is considering, and the owner merely as the guardian of that interest; if, then, some other persons are present, who, with reference to that interest, are equally certain

to bring forward the entire merits of the question, the object is satisfied for which the presence of the actual owner would be so required, and the court may, without putting any right in jeopardy, take its usual course and make a complete decree.' "

Our conclusion, therefore, is that the bondholders were not necessary parties. But, in view of the fact that the trustee was justified in refusing to make disposition of the insurance money without the sanction of a court of equity, we deem it proper to order the costs paid out of the fund in controversy.

*Decree reversed, and cause remanded for further proceedings in accordance with this opinion, the costs to be paid out of the fund in controversy.*