HADJIS ET UX. *v.* ANDERSON, Attorney Named in Mortgage

[No. 122, September Term, 1970.]

*Decided December 9, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, FINAN, SINGLEY and SMITH, JJ.

*Nicholas J. Fotos* for appellants.

*Richard G. Anderson,* with whom were *Anderson & Anderson* on the brief, for appellee.

SINGLEY, J., delivered the opinion of the Court.

Mr. and Mrs. George C. Hadjis (Hadjis), regarding themselves as having been badly used by Wellham Building and Loan Association, Inc. (Wellham), which held the mortgage on property owned by them, filed exceptions to the ratification of the report of sale filed by the attorney named in the mortgage, who had foreclosed the mortgage and sold the property for $20,000. From an order of the Circuit Court for Anne Arundel County granting the mo-

tion to dismiss which Wellham made at the end of Hadjis' case and overruling Hadjis' exceptions, this appeal was taken.

The facts underlying the controversy can be briefly told. On 6 January 1966, Hadjis borrowed $24,000 from Wellham. The loan was secured by a purchase money mortgage on an improved quarter-acre tract in Glen Burnie. The mortgage provided for the payment of 6% interest and called for monthly payments of $225 commencing 20 February 1966 to be applied to the payment of interest; then to the payment of taxes, insurance premiums and public charges; and finally, to the reduction of principal. Among the covenants of the mortgage was an undertaking "to keep the buildings on the premises insured against loss by fire and windstorm and all hazards for the benefit of the Mortgagee, its successors or assigns, in some company acceptable to [Wellham], its successors or assigns, to the extent of its lien thereon, and to deliver the policy and all renewal receipts to [Wellham], its successors or assigns * * *." Two policies of fire and extended coverage insurance on the property were written by Insurance Company of North America (the Insurer) in the total amount of $20,000. Wellham was identified as the mortgagee in each policy, and each provided, in substance, that loss would be payable to Wellham, as its interest might appear, subject to the provisions of the usual mortgagee clause attached to the policy.

An examination of Wellham's ledger card, introduced in evidence below, shows that Hadjis had kept his monthly payments current or had brought them to date through most of 1966 and 1967, but that by the end of 1967, had begun to run one or two months behind. In December of 1967, he made an additional borrowing from Crest Investment Trust, Inc. (Crest), secured in part by a second mortgage on the property. The monthly mortgage payment due 20 September had been paid only in part and the October payment was unpaid when, on 18 November 1968, the improvements on the premises were destroyed by fire. There were no further payments until

late December, when the October and November installments were met. In February, the December installment was paid in part.

Meanwhile, efforts to adjust the fire loss were under way, which resulted in the recovery of $8,922.68 from the Insurer, a portion of which was claimed by the firm of public adjusters who had represented Hadjis. In February, 1969, Wellham sent the Insurer's checks to Hadjis with instructions to obtain the endorsements of Crest and of the public adjusters, to endorse them himself, and to return them to Wellham. When the checks were not returned, Wellham brought a declaratory action in the Circuit Court for Anne Arundel County against Hadjis, the other payees of the checks and the Insurer, which sought to impress an equitable lien on the insurance proceeds. Hadjis and Crest failed to answer; a decree pro confesso was entered against them; Hadjis paid the public adjuster's fee, and the case was ultimately settled when the checks for $8,922.68, properly endorsed, were delivered to Wellham.

What happened next sowed the seeds of this controversy. On 11 June, Wellham applied $424.68 of the insurance proceeds to the arrearages of interest on the mortgage, bringing these payments to date, and applied the balance, or $8,498.00, to the reduction of the principal debt, thus reducing it from $21,234.12 to $12,736.-12. We have not been able, on the record before us, to determine the amount by which payments in reduction of principal were in arrears on 11 June, but it is fair to assume that they approximated $500.00, so that the balance of the insurance proceeds remaining in Wellham's hands was about $8,000.00.

The record is scanty as to how this came about. Hadjis testified—and his testimony was not controverted—that when he delivered the insurance checks to Wellham's counsel a discussion took place:

> "[W]hat I did tell them is this that I will sign the checks over to you provided I will have time

34

to sell my properties, in other words not to pay any monthly installments as they fall due but be paid from the proceeds of the checks I had given him until I sell it or refinance the property. What had caused me to do so and wanted them to apply them in this fashion was that Wellham Building & Loan Association at one meeting with the Directors and Mr. Richard Anderson present there indicated they would not allow me to rebuild or repair the place because they said, 'We don't want you to put good money into the burnt building,' and this was told by the President, Mr. Cromwell, and in another instance I was told [point] blank, 'We don't want you to be —we don't want to have you here in our mortgage—in our—with our Association. You are a bad payer.' "

Hadjis continued:

"After I delivered the checks to the—to Mr. Marvin Anderson [counsel for the Association] and we had our little brief discussion that evening, he said, 'I will see what I can do with the Association,' and that was the last I heard from them. No notification that how they applied the monies, the proceeds towards the account or anything else."

Hadjis' testimony was that the only notice he received thereafter was a letter of 3 November 1969, advising him that the foreclosure proceeding had been instituted.

Ernest R. Smoot, Secretary of Wellham, was called as a witness by Hadjis. He testified on direct examination:

"[Q] At whose direction did you post in this manner [by crediting principal with $8,-498 on 11 June 1969], sir?
"A. Whenever there is a fire loss then the proceeds of the fire insurance policy are usually applied to the principal of the mortgage.

"[Q] And this is the policy that you applied in this case?

"A. I have applied that for thirty-five years in the banking and building and loan business.

"[Q] And this is why you applied [it] in this case because of policy?

"A. That's the policy that should be applied."

Bearing in mind that on review of the granting of a motion to dismiss, the evidence and the logical and reasonable inferences to be drawn therefrom must be taken in the light most favorable to the plaintiff, Maryland Rule 535; *Price v. Levin,* 248 Md. 158, 235 A. 2d 547 (1967), on the record before him, the chancellor could have found the following facts. Hadjis' mortgage secured a 15 year level payment direct reduction loan.[1] His payment record was erratic and the mortgage had been technically in default most of the time from late 1967 until the insurance checks were credited to the account on 11 June. Hadjis had reason to assume that he had worked out an arrangement for taking care of monthly payments from and after 20 June, because he testified no payments were demanded and no notice of acceleration was given.

Because we are satisfied that the motion to dismiss should not have been granted, we propose to reverse the order overruling the exceptions and remand the case for further proceedings in order that Wellham may have the opportunity to make a record justifying the action it took, if it can. Because it may be of assistance to the chancellor at the new hearing, and may minimize the likelihood of a further appeal, we propose to summarize what we conceive to be the law applicable to the facts in the record before us.

We do not question Wellham's right to retain the insurance proceeds. It was an insured named in the policy

---

1. In his testimony, Hadjis said the mortgage was for 20 years; however, an examination of Financial Publishing Co., *Monthly Payment Direct Reduction Loan Amortization Schedules* (9th ed. 1958), indicates that this was a 15 year loan.

and had the right to retain such of the proceeds as did not exceed the amount of the mortgage debt, *Federal Land Bank of Baltimore v. Cosimano,* 165 Md. 333, 168 A. 886 (1933) ; *Woody v. Lytton Savings & Loan Ass'n,* 229 Cal.App.2d 641, 40 Cal. Reptr. 560 (1964). If the proceeds were to be applied to restoration, this would have had to be done by agreement between Wellham and Hadjis, since no procedure was spelled out in the mortgage.

Once it is granted that Wellham had the right to retain the proceeds, there follows the question, how were they to be applied? It is abundantly clear that the application of the insurance proceeds was not governed by the terms of the mortgage, but that the determination was made on the basis of what Mr. Smoot described as "policy," for which we can find no support in the law. At any time after 20 September 1967 and prior to 11 June 1969, Wellham could have given notice that it proposed to accelerate the maturity of the mortgage because of continuing delinquency and could have demanded payment of the debt. This it did not do. Even the letter which Wellham wrote to Hadjis on 13 February 1969 threatening foreclosure was predicated on Hadjis' failure to deliver the insurance checks. Presumably this was cured when Wellham accepted the checks.

As we see it, in the absence of an appropriate provision in the mortgage, Wellham had at least three alternatives open to it when it received the checks:

(i) It could have suggested to Hadjis that it would have been willing to hold $8,498.00 in escrow, and with Hadjis' consent or at his direction, could have applied this sum to Hadjis' monthly payments of $225 until the sum was exhausted, when payments would again commence.

(ii) It could have advised Hadjis that it would apply the $8,498.00 to the *first* installments of principal to be due thereafter, until the sum was exhausted by such applications. Until such time, Hadjis' monthly payments would have been $63.68 (6%

on the reduced principal balance of $12,736.12) together with whatever amount was required to keep the expense account for taxes and insurance premiums current. At such time as the $8,498.00 had been exhausted, Hadjis' monthly payments would revert to $225.

(iii) It could have advised Hadjis that it proposed, if he would consent, to apply $8,498.00 to the satisfaction of the *last* installments of principal due under the mortgage, and that the amount of his monthly installments would continue to be $225.

Hadjis apparently thought that he had accomplished a resolution of the problem based on alternative (i). That there was a communications gap of major proportions, as the chancellor noted in his oral opinion, cannot be doubted. Perhaps Hadjis would have been well advised not to let the matter lie in limbo, but in all fairness, sophistication in matters of mortgage financing cannot be attributed to every borrower, who frequently feels that he must dance to the tune called by the lender. The lender's duty to communicate with its borrower may be a minimal one, but it exists, nonetheless.

Alternative (ii) would have been the fairest one, since it would have given Hadjis credit for Wellham's use of the insurance proceeds during the term of the mortgage.

On the record before us, we cannot tell what course Wellham intended to pursue. The ledger card contains a single entry on 20 June of $63.68 in the column headed "interest." If Wellham is able to show that it formally adopted alternative (ii) and billed Hadjis for interest in this amount commencing 20 June and that he failed to pay, we could not fault the foreclosure.

There is a lurking possibility, however, that Wellham may have decided to adopt alternative (iii), and apply the $8,498.00 in satisfaction of the *last* installments of principal, and somehow persuade Hadjis to continue monthly payments of $225. This, of course, would have amounted to a unilateral modification of the mortgage

contract, for it would have substantially shortened the 15 year term for which the loan was made.

Our conclusion that Wellham had no right to foreclose on the basis of the record before us is supported by authority. In *Cottman Co. v. Continental Trust Co.*, 169 Md. 595, 182 A. 551 (1936), Cottman had mortgaged nine tugboats to secure an issue of debentures. Three of the tugs were damaged and repaired at Cottman's expense. Recovery in the amount of $4,263.00 was had on policies of insurance, which was claimed by Continental Trust Company under a provision of the mortgage that policies of insurance were to be "properly endorsed so as to protect the interest of the mortgagee or trustee." The mortgage did not provide how the insurance recovery was to be applied or used. In the course of an opinion holding that Cottman Company, having repaired the boats, was entitled to the insurance proceeds, the Court said, 169 Md. at 601:

> "The general rule is that where property is insured under these circumstances, and a total loss occurs, *the mortgagee is entitled to retain the insurance proceeds, and apply them to the extinguishment of any then existing overdue indebtedness, or to future installments as they become due.*" (emphasis supplied)

and cited with approval *Thorp v. Croto*, 79 Vt. 390, 65 A. 562, 10 L.R.A. (n.s.) 1166 (1907).

Admittedly, this was dicta, not necessary to the result reached in *Cottman*, but in accord with the weight of authority. *Thorp* held that a mortgagee who recovers on a policy of fire insurance maintained by a mortgagor for the benefit of the mortgagee must apply the proceeds of the policy to the extinguishment of the mortgage debt as it becomes due. To the same effect is *Zeigler v. Fed. Land Bank of Houston*, 86 S.W.2d 864 (Tex.Civ.App. 1935); but compare *Lee v. Murphy*, 253 Cal.App.2d 205, 61 Cal. Reptr. 174 (1967), where the rule of *Thorp* was held to have been modified by agreement, and *Terraqua Corp. v.*

*Emigrant Industrial Savings Bank,* 190 Misc. 474, 75 N.Y.S.2d 453 (1947), *aff'd* 273 App. Div. 254, 76 N.Y.S.2d 610 (1948), where a different result was ordained by statute. See also, *Fergus v. Wilmarth,* 117 Ill. 542, 7 N. E. 508 (1886).

2 *Jones on Mortgages* § 1164 at 637-38 (8th ed. 1928) states the general rule:

> "* * * Thus, for instance, money paid upon a policy of insurance, obtained by the mortgagor for the benefit of the mortgagee, for a loss by fire, can not be applied to the payment of the debt, if it be not due, without the consent of the mortgagor. * * *
>
> * * *
>
> "Where buildings on the mortgaged premises are insured for the benefit of the mortgagee he must, upon collecting the insurance money, hold it and apply it upon the indebtedness as it falls due, unless the mortgagor agrees to a different application."

To the same effect is 5 *Couch on Insurance* § 29.94 at 377 (2d ed. 1960):

> "It is not clear to what extent the mortgagee may or must apply the proceeds of insurance to the payment of a mortgage debt which is not due at the time he receives the proceeds of insurance. Where the mortgage debt is represented by a series of notes it has been held that the proceeds are applied to the payment of the interest due on all the notes secured by the mortgage and the balance appropriated to the payment pro tanto of the principal of the unpaid note first payable. In contrast, there is authority that the mortgagee cannot apply money received by him to the payment of an unmatured debt without the consent of the mortgagor and that a mortgagee, for whose benefit insurance is taken

out by the mortgagor, must, upon collecting the proceeds, hold the fund and apply it upon the indebtedness as it falls due, unless the insurer consents to a different application. Likewise a mortgagor's request that the insurance proceeds be applied to the payment of a past-due instalment and an instalment to become due precludes the mortgagee from applying them to the payment of principal not due.

"Generally, where a mortgagee receives the proceeds of insurance on property under a policy for his benefit containing a 'loss payable' clause, he may, where the loss was total and the mortgagor was in default of the security impaired, retain and apply the proceeds to existing overdue indebtedness or to future instalments as they become due."

Similar expressions may be found in 5A Appleman, *Insurance Law and Practice*, § 3386 at 270, § 3405 at 316 (1970) and in 36 Am. Jur. *Mortgages*, § 339 (1955).

*Crone v. Johnson*, 240 Ark. 1029, 403 S.W.2d 738 (1966) dealt with a problem substantially similar to the one before us. In *Crone*, improvements on the mortgaged premises were damaged by windstorm. The insurance company drew a check payable jointly to the mortgagor and mortgagee, who could not reach agreement as to the manner in which the insurance proceeds were to be applied. The mortgagee gave notice of the acceleration of the obligation and instituted foreclosure proceedings. In the course of an opinion remanding the proceeding and holding the attempted acceleration a nullity and the foreclosure to have been improvidently instituted, the Court said:

"Even though insurance is payable to the mortgagee as his interest may appear, it does not follow that the mortgagee is entitled to apply the money in any way he chooses. Bonham v. Johnson, 98 Ark. 459, 136 S. W. 191 (1911). In a

proper case—and we regard this as such a case —the funds may be used to pay current installments as they fall due. Appleman, Insurance Law & Practice (1941) § 3386; Zeigler v. Federal Land Bank, 86 S.W.2d 864 (Tex.Civ.App. 1935); Thorp v. Croto, 79 Vt. 390, 65 A. 562, 10 L.R.A.,N.S., 1166, 118 Am.St.Rep. 961, 9 Ann.-Cas. 58 (1907). Here that course achieves an altogether equitable result. Mrs. Johnson [the mortgagee] has the benefit of the insurance proceeds in the reduction of the mortgage debt, while Crone [the mortgagor] receives an interruption in the monthly payments at a time when he needs to use his income for repairs.

"Similar principles of justice permit a court of equity to protect the debtor against an inequitable acceleration of the maturity of the debt. Johnson v. Guaranty Bank & Tr. Co., 177 Ark. 770, 9 S.W.2d 3 (1928). Here the misfortune of the windstorm ought not to cause Crone to lose his equity in the property. The insurance money should have been applied to prevent the default that Mrs. Johnson relied upon in declaring the entire indebtedness payable at once." 403 S.W.2d at 740.

The only possible justification of Wellham's position might have been that the maturity of the mortgage debt had been accelerated by one or another of Hadjis' delinquencies. Even conceding that the maturity of the debt could have been accelerated under the provisions of the mortgage, had Hadjis been in default in the performance of any covenant for 30 days, it is clear that an acceleration clause is not self-operating, since it is inserted for the protection of the mortgagee, who may or may not elect to rely upon it, *Better v. Williams,* 203 Md. 613, 102 A. 2d 750 (1954); *Kleiman v. Kolker,* 189 Md. 647, 57 A. 2d 297 (1948); 59 C.J.S. *Mortgages* § 495 (5) at 790, and that a mortgagee must take some positive action to show

that it intends to accelerate the maturity of the obligation. On the record before us, there is no evidence that Wellham did this prior to the institution of the foreclosure proceeding when Hadjis believed any default had been cured by the receipt of the insurance proceeds.

> *Order overruling exceptions reversed, case remanded for further proceedings conformable with this opinion. Costs on appeal to be paid by appellee, costs below to abide the result.*