# CONNECTICUT MUTUAL LIFE INSURANCE COMPANY *v.* SCAMMON & Others.

## APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

Submitted March 12, 1886.—Decided April 12, 1886.

A father owning in fee an equal undivided one third part of a lot of land, and having a life tenancy in the other equal undivided two third parts, and his two daughters each owning in fee an equal undivided one third part, subject to such life tenancy, the three executed a mortgage on the lot, for a loan of $30,000, in which the mortgagors agreed to keep the building on the lot insured against fire, in its fair insurable value, and assign the policy to the mortgagee, to be held by him "as collateral and additional security," with the right to collect the insurance money and apply it on the mortgage. On a partition of the lot between the father and the daughters, they paid $10,000 to the mortgagee, on the principal, and he released from the mortgage the part belonging to the father. The father, with the money loaned, had erected a building on the part of the lot allotted to the daughters, and he thereafter collected for his own use the rents, and paid the interest on the mortgage, and the taxes, and the fire insurance premiums. The building, being insured for $15,000 by a policy in the name of the father, the loss being made payable to the mortgagee, was destroyed by fire. The loss being more than that sum, the mortgagee received a draft for $15,000 on the insurance company, drawn by its agent, to the order of the mortgagee, and agreed in writing with the father, by an instrument which stated that the mortgagee held the policy as collateral security for the payment of the loan, that the right to apply the $15,000 on the debt was waived, and that the money should be deposited in a bank to be selected by the father, to his credit and at his risk, to be used in erecting a building on the lot, the money to be paid out on the father's checks, countersigned by the mortgagee, within six months, or the waiver to be of no effect, and the mortgagee to have the right to apply the money on the debt. Thereupon the mortgagee endorsed the draft to the order of the father, he designating as the bank of deposit a bank of which he was president, and taking the draft and collecting it, and depositing the money to his credit in the bank. The mortgagee countersigned no checks against the money, and no building was put up. The daughters had no knowledge of the transaction. In a suit to foreclose the mortgage, the daughters claimed that the $15,000 should be credited on the mortgage, as against them : *Held,*

(1.) Authority in the father, as representing his daughters, to make the agreement as to the $15,000, could not be implied from the general power he exercised over the property, in managing it, and procuring insurance and paying taxes, the daughters having themselves executed the mortgage ;

(2.) The insurance was obtained in pursuance of the requirements of the mortgage, and must be presumed to have covered the interests of all the mortgagors, as an entirety ;

(3.) The mortgagee in fact dealt with the $15,000, not as the father's money, but as representing a further security furnished under the mortgage, and as something which concerned the rights of all the mortgagors, because the agreement with the father recognized the obligation either to credit the money on the mortgage or to see that it went to restore the building ;

(4.) The provision of the policy, that the loss should be payable to the mortgagee, placed him in the same position as if the policy had been in the name of all the mortgagors and been assigned to the mortgagee, and he was bound to apply the money in accordance with the provisions of the mortgage, for the benefit of all the mortgagors, unless all consented to a different disposition of the money ;

(5.) In any view, if the agreement with the father was valid, as against the daughters, the mortgagee was bound to see that the money was used to restore the building, or else credit it on the mortgage ;

· (6.) That the transaction amounted to a collection of the $15,000 by the mortgagee, and as a satisfaction of the mortgage to that extent, as respected the estate of the daughters, leaving the mortgage a lien for $20,000, as regarded the life estate of the father.

It is proper to sell the estate in remainder and the life estate separately, and to apply the proceeds of the latter first to satisfy the amount for which it is the sole security, not applying any of such proceeds to pay costs, or taxes, or any part of the debt for which there is other security, till the full payment of the sum for which the life estate is the sole security.

This was a bill in equity to foreclose a mortgage. The case is stated in the opinion of the court.

*Mr. Edward S. Isham* and *Mr. Robert T. Lincoln* for appellant.

*Mr. W. I. Culver* and *Mr. Charles F. White* for appellees.

Mr. Justice BLATCHFORD delivered the opinion of the court.

On the 10th of September, 1866, J. Young Scammon, of Chicago, Illinois, and Florence A. D. Scammon and Arianna E. Scammon, his daughters, were the owners of a lot of land in Chicago, No. 90 Michigan Avenue, known as " lot number five (5), in block number eleven (11), in Fort Dearborn Addition to Chicago," the father being the owner in fee of an equal undivided one third part of the lot, and having a tenancy for life

in the other equal undivided two third parts; and his two daughters being each the owner in fee of an equal undivided one third part, subject to such tenancy for life of the father. The lot had descended to the two daughters and a brother of theirs from their mother, subject to the tenancy for life of the father, and he had purchased from the son the fee of his equal undivided one third part.

On the day above named, Scammon and his daughters executed to the Connecticut Mutual Life Insurance Company, a corporation of Hartford, Connecticut, a mortgage covering the above lot by the above description, to secure the payment of $30,000, in five years, with semi-annual interest at 8 per cent. per annum, according to the condition of a bond which they at the same time executed. The bond stated that it was given for an actual loan of money made by the obligee to the obligors on the day of its date.

The mortgage contained the following covenant on the part of the mortgagors: "And further, that they, their heirs, executors, and administrators, shall and will, at all times hereafter, until said principal sum of money, and all arrearages of interest thereon, shall be fully paid, keep all the buildings (outhouses excepted) now situate, or that hereafter may be erected, upon said premises, fully insured against loss or damage by fire, in some good and responsible insurance company or companies (satisfactory to the said party of the second part, its successors or assigns, or its or their authorized agent), in the fair insurable value of such buildings, and will legally and properly assign and deliver to the said party of the second part, its successors or assigns, each, all, and every, the policies of insurance therefor, as soon as and whenever such insurance shall be effected, and will also deliver to said party of the second part, its successors or assigns, or its or their authorized agent, all premium or renewal certificates received for the payment of the premium upon such policy or policies of insurance, as soon as and whenever such certificates shall be issued; and, in default of so doing, the said party of the second part, its successors or assigns, at its own or their option, may effect such insurance in its or their name or names, or otherwise, and the

premium money paid therefor shall be a charge upon said premises, and shall be secured by this instrument in the same manner as the said principal sum of money above mentioned is secured, and such premium money shall be paid by said parties of the first part, their heirs and legal representatives, to said party of the second part, its successors or assigns, on demand, and may be collected at any and all times after the same shall have been paid, with interest thereon at the rate of ten per centum per annum from the time the same shall be advanced, and the said party of the second part, its successors or assigns, shall hold each and all such policies of insurance so received, by assignment or otherwise, as collateral and additional security for said principal sum of money and interest, and shall have the right to collect and receive any and all money and sums of money that may at any time become collectible or receivable upon each, all, and every of such policies of insurance, and apply the same, when received, in the same manner, as far as possible, as is hereinafter provided for in case of a sale of said above described premises under the power of sale hereinafter contained. But nothing herein contained shall be construed as requiring the said party of the second part, its successors or assigns, to incur any expense, or make any effort, to collect any money that may become due on any of such policies of insurance; but, if it or they shall elect not to collect the same, they shall make such election within a reasonable time after such money shall become collectible, and, on demand of said parties of the first part, or their legal representatives, shall thereupon forthwith, after making such election not to collect, reassign and deliver such policy or policies of insurance to said parties of the first part, their executors, administrators, or assigns."

In the fall of 1867, by an arrangement between Scammon and his daughters, the south one-third part of the lot was conveyed to his appointee by them, in fee, as representing his existing interest in fee in the lot, and the north two thirds part of the lot was conveyed by him to them as tenants in common, in fee, as representing their existing interest in fee in the lot, subject, as to such north two thirds part, to the life estate of

the father therein. Thereupon, the father and daughters paid or caused to be paid to the mortgagee $10,000, as a reduction of the principal of the mortgage, and it released, by deed, from the lien of the mortgage, such south one third of the lot.

With the money lent on the mortgage, Scammon erected a building on the north two thirds of the lot, and thereafter collected for his own use the rents from it, and paid the interest on the mortgage, and the taxes and the fire insurance premiums. Insurance against fire, covering the building, for $15,000, was effected by Scammon, by a policy issued by the Liverpool and London and Globe Insurance Company in his name, with a clause making the loss payable to the mortgagee. The building was destroyed by fire in October, 1871, and, the loss being adjusted at a sum greater than $15,000, a draft for $15,000 was drawn at Chicago, by the agents of the fire insurance company there, on that company, at New York, payable to the order of the mortgagee. The draft was handed to Scammon, and, at his request, the agent of the mortgagee at Chicago sent it to the mortgagee, at Hartford, with an application from Scammon to have the $15,000 paid to him, to enable him to rebuild the building. Thereupon the following instrument was executed in duplicate by the mortgagee and Scammon, a copy being retained by each:

"Memorandum of agreement made and entered into this fifth day of January, A.D. 1872, between the Connecticut Mutual Life Insurance Company, a corporation subsisting by the laws of the State of Connecticut, and located and doing business in the city of Hartford, in the State of Connecticut, of the one part, and J. Young Scammon, of the city of Chicago, in the county of Cook, and State of Illinois, of the other part, witnesseth: That whereas the said party of the second part did, on the tenth day of September, A.D. 1866, make, execute, and deliver to the said party of the first part a certain indenture of mortgage, bearing date on that day, on the following-described premises, situate and being in the city of Chicago aforesaid, to wit, lot number five (5), in block number eleven (11), in Fort Dearborn Addition to Chicago, for the purpose of securing the payment of the certain bond or obligation of the

said party of the second part, bearing even date with said mortgage, in the penal sum of sixty thousand dollars, conditioned for the payment to said party of the first part of the sum of thirty thousand ($30,000) dollars on the tenth day of September, A.D. 1871, with interest as therein stated, on which said mortgage has been paid ten thousand dollars of principal; and whereas, the building on said premises, known as No. 90 Michigan avenue, in said city of Chicago, was insured in the following company and in the following amount, to wit, the Liverpool and London and Globe, in the sum of fifteen thousand dollars, which said policy of insurance was held by said party of the first part as collateral security for the payment of said loan, any loss on said policy to be paid to said party of the first part; and whereas said building has been destroyed by fire and the insurance moneys to be received on said policy or policies are subject to be paid to said party of the first part, in accordance with the conditions of said mortgage; and whereas said party of the second part desires said party of the first part to permit and suffer said insurance money to be used in and upon said mortgaged premises in the reconstruction of said building or buildings thereon, and said first party is willing to have said insurance money so used, upon the terms and conditions hereinafter set forth, and to assist in the collection and receipt thereof by said second party from said fire insurance company or companies for the purposes aforesaid: It is, therefore, mutually agreed by and between the parties hereto, that said party of the first part waives, except as hereinafter provided, its right to apply on the said indebtedness the moneys that may be received on said policy or policies of insurance, and that any and all such sum or sums of money as shall be so collected from said fire insurance company or companies by either of the parties to this instrument shall be deposited in such bank or banks as shall be selected by the party of the second part and assented to by the said first party, to the credit and at the risk of said party of the second part, to be used in the erection of said building or buildings on said mortgaged premises.

"That said money shall be paid out and expended in the erec-

tion of said building or buildings, from time to time, on the drafts or checks of said party of the second part, countersigned by the said party of the first part, or its duly authorized agent or attorney, until said insurance money is fully expended, as herein provided, on said mortgaged premises. That said drafts or checks shall be so countersigned upon the presentation thereof to said party of the first part, its duly authorized agent or attorney, together with a certificate of a competent and credible architect, that the amount of said check or draft, together with all previous checks or drafts drawn or paid out on said account, has been actually expended in and upon said mortgaged premises, in the permanent improvements thereon, and that the work and material for which the amounts so expended have been paid are fully worth such sum.

"If, however, said buildings are being constructed without the supervision of an architect, the affidavit of said party of the second part to said facts may, at the option of said first party, be received in lieu of said architect's certificate. And it is further understood and agreed, that, so soon as said building or buildings shall be in a situation to be insured, said party of the second part shall cause the same to be insured in some good and responsible insurance company, in the fair insurable value thereof, and assign and deliver the same to said party of the second part, and, as soon as said building shall become so insurable, all the provisions contained in said above-described mortgage shall apply to said insurance, and said conditions are hereby made a part of this agreement.

"It is also expressly understood, that any receipt or acknowledgment given by said party of the first part, either alone or jointly with others, to any such insurance company or companies, for the purposes aforesaid of facilitating the collection by said second party of any insurance money intended to be placed back on said mortgaged premises as aforesaid, shall not be construed as a collection of said money by said first party under the conditions of said mortgage, wherein and whereby it is provided that said first party may collect and apply such insurance money upon the indebtedness secured to be paid thereby, but merely as enabling said second party to collect

said insurance moneys. Said moneys are not to be so applied, and said mortgage shall remain a lien on said mortgaged premises for the full amount of the principal money mentioned in said bond, with the interest thereon, as if said moneys had never been collected.

"It is also further expressly understood and agreed, that said insurance money shall be expended on said mortgaged premises as above provided, with all reasonable and proper dispatch; and that, in the event that, from any cause, whether the death or absence of any party or parties to this agreement, or any other cause, said money shall not have been so expended within six months from the date hereof, then this agreement of waiver shall thereupon become thenceforth null and of no effect, and the right of said second party to use and expend said moneys shall thereupon cease, and said first party shall have the right to draw from the said bank or banks, upon its own check or checks, or that of its authorized agent, said insurance moneys, or so much thereof as shall not then have been actually expended as provided in this agreement, and apply the same in payment *pro tanto* of the indebtedness secured by said mortgage, and such check or checks of said first party or its agent as aforesaid, drawn at any time after the expiration of six months from the date hereof, shall be a full discharge and acquittance to said bank or banks for any moneys paid thereon.

"It is expressly agreed, that time shall be of the essence of this agreement in all its parts, and that said agreement shall be binding upon the heirs, executors, administrators, successors, and assigns of the respective parties."

On the execution of this agreement, the mortgagee endorsed the draft, making it payable to Scammon or his order, and sent it to its agent at Chicago. Scammon signed on the agreement a written designation by him of "the Marine Company of Chicago," a banking institution of which he was then president, as the banking office in which to deposit the $15,000; and the draft was then delivered by the agent to Scammon, and collected, and its proceeds were deposited to his credit in the Marine Company. The transaction between Scammon and the agent took place at the banking company's office, and the

agent exhibited the copy of the agreement to Scammon, as president of the bank. No checks against the money were ever countersigned by or on behalf of the mortgagee, nor was any of it used in putting up any new building on the lot, nor was any such new building put up. Scammon's daughters had no knowledge or information as to any part of the transaction between their father and the mortgagee in regard to the $15,000.

Under that state of facts, the mortgagee, in June, 1876, filed a bill in equity, in the Circuit Court of the United States for the Northern District of Illinois, for the foreclosure of the mortgage, making as defendants Scammon and the two daughters, and Reed, the husband of one of them, and other persons. The bill credits the payment of the $10,000, in November, 1876, as one by Scammon and his daughters, in reduction of the principal of the mortgage, and sets forth the release of the south one third of the lot from the lien of the mortgage, but ignores any credit of the $15,000, and claims as due $20,000, with interest at 8 per cent. per annum from September 10, 1873, and moneys paid by the mortgagee for taxes and assessments.

Mrs. Reed and her sister answered the bill. The answer sets forth the transaction in regard to the $15,000, and avers that it took place without the knowledge, authority or consent of the daughters, and that the mortgagee, in consenting to the use of the $15,000 in any other way than in payment of the mortgage indebtedness, relied on the credit of Scammon and released the property of the daughters to that extent. It claims that Scammon's life estate in the north two thirds part of the lot should be first sold, and the proceeds be applied first in payment of the remaining $5000 and interest, and the property of the daughters be thereupon released from all further liability.

After issue, the court referred the cause to a master, to take proofs and report them, with the amount due to the plaintiff. He reported the testimony, and that there was due $20,000 of principal, and interest from September 10, 1873, and certain sums paid by the plaintiff for taxes and assessments, with

interest thereon. Mrs. Reed and her sister excepted to the report, and the case was heard on the exceptions. The court rendered a decision, 4 Fed. Rep. 263, in which it was ruled, (1) that authority in Scammon, as representing his daughters, to make the special agreement in regard to the $15,000, could not be implied from the general power he exercised over the property, in managing it, and procuring insurance and paying taxes, the daughters having themselves executed the mortgage; (2) that the insurance was obtained in pursuance of the requirements of the mortgage, and must be presumed to have covered the interests of all the mortgagors, as an entirety; (3) that the mortgagee in fact dealt with the $15,000 not as Scammon's money, but as representing a further security furnished under the mortgage, and as something which concerned the rights of all the mortgagors, because the agreement it made with Scammon recognized its obligation either to credit the $15,000 on the mortgage or to see that it went to restore the building; (4) that the provision of the policy, that the loss should be payable to the mortgagee, placed it in the same position towards all the mortgagors as if the policy had been taken out in the names of all, and assigned to the mortgagee; and it was bound to apply the $15,000, in accordance with the provisions of the mortgage, for the benefit of all the mortgagors, unless all consented to a different disposition of the money; (5) that, in any view, if the agreement with Scammon was valid, as against the daughters, the mortgagee was bound to see that the money was used to restore the building, or else credit it on the mortgage.

Under these views, the court referred the case back to the master, with directions to restate the account according to the principles thus laid down. He did so, and, the case being heard on his report, the court, on the 2d of October, 1882, rendered a decree, which, after setting forth the material facts above stated, contains the following clauses:

"The court further finds, that, when the complainant originally took the said mortgage, it, by its agent, knew the state of the title of the mortgaged premises; that, in the erection of the building on said premises, and causing it to be insured, and

in collecting rents and paying the insurance premiums and taxes, the defendant J. Y. Scammon held the property as if it was his own; that the entire business connected with the loan from the complainant, from the time of its original negotiations down to the time of the before-mentioned agreement in relation to the insurance, was transacted by J. Y. Scammon, who kept an account of the property in his bank ledger, in which rents by him received were credited, and the moneys paid out were also entered; that the defendants Florence A. D. Reed and Arianna E. Scammon knew nothing, at the time, of the insurance obtained upon the property, nor anything in relation to the agreement between their father and the complainant made in 1872; that the complainant entered into the agreement for the payment of the insurance money to Scammon to be by him used in rebuilding, in good faith; and that said Scammon received it in good faith for that purpose, and the officers of the bank where it was deposited understood that the money was deposited there as a special deposit, subject to said agreement.

"The court further finds, that Florence A. D. Reed and Arianna E. Scammon did not know that this insurance had been effected on the property, or of the payment of premiums thereon, and were never consulted about the disposition of the insurance money, and had no knowledge of, and gave no consent to, its payment to their father and its deposit in the bank, and have never asserted any rights in relation thereto until the commencement of this suit.

"The court further finds, that the acts of Florence A. D. Reed and Arianna E. Scammon were limited to the execution of the bond and mortgage and the making of the agreement for partition; that said insurance was furnished under the covenants of the mortgage, and pursuant to the requirements thereof, and was an additional security held by the complainant for the payment of the principal sum and interest secured by said mortgage, and that the covenants in the mortgage for insurance operated as an assignment of the insurance fund, when collected, to the mortgagee; that the acts of the complainant, its receipt of the draft for said insurance money, and its endorsement

thereof to the defendant J. Y. Scammon, by ordinary commercial endorsement, and its assumed control over the ultimate destiny and use of the proceeds thereof, were equivalent to a collection of the insurance by the complainant; that the receipt by the complainant of said insurance money operated as a satisfaction *pro tanto* of said mortgage, so far as the estate and interests of the defendants Florence A. D. Reed and Arianna E. Scammon are involved, but that, so far as the life estate of J. Young Scammon is concerned, said mortgage remains an equitable lien and encumbrance for the full amount thereof."

The decree then goes on to declare that there is due, at this date, from Scammon to the plaintiff, on the bond and mortgage, $20,000 of principal and $13,093.32 of interest, as reported, and $1404.44 for interest since the date of the report; and $3275.42 for moneys paid for taxes and to redeem from tax sales, and $490.73 for interest thereon, as reported, and $287.51 for interest since the date of the report; being, in all, $38,551.42; that that sum is a valid and first lien on the estate of Scammon, for his life, in the north two-thirds of the lot (excepting therefrom a strip from off its north side, hereinafter mentioned); that, of the $38,551.42, Mrs. Reed and her sister are personally liable for $5000 of principal, and $3273.33 interest thereon, as reported, and $351.11 interest on the $5000 since the date of the report, and for the above-named sums of $3275.42, $490.73, and $287.51, being in all $12,678.10, which is a valid and first lien on the estate in remainder of them and each of them, after the expiration of the life estate of Scammon, in the north two-thirds of the lot (excepting therefrom the strip above referred to); and that the $12,678.10 is a valid and first lien on said strip. The decree then provides for the sale at public auction of such estate in remainder, excepting the strip, and of such life estate, excepting the strip, and of the strip, each separately; and directs that the proceeds of the life estate be applied first to the satisfaction of the amount for the payment of which the life estate is decreed to be the sole security, and that no portion of the amount realized from the sale of the life estate shall be applied to pay the costs of the suit, or

any moneys found due for taxes, or on account of that part of the principal or interest of the bond for which there is other security, until the sum for which the life estate is the sole security shall have been fully paid. From this decree the plaintiff appealed to this court.

The plaintiff assigns for error that the Circuit Court erred in giving the daughters credit for the $15,000. But we are of opinion that the views of that court in its decision, as above set forth, and as embodied in the decree, were correct.

The policy of insurance was a collateral security for the joint debt of the mortgagors, furnished in compliance with the provisions of the mortgage, and the mortgagee was bound to apply the insurance money to the payment of the joint debt, according to the terms of the mortgage. In the agreement with Scammon, of January 5, 1872, the mortgagee declares that it held the policy " as collateral security for the payment" of the loan secured by the mortgage, and that the $15,000 is subject to be paid to it " in accordance with the conditions" of the mortgage. Although the policy was taken out in the name of Scammon, it was, under the mortgage, a part of the security covenanted for therein; and must be treated as having been furnished by, and for the benefit of, all the mortgagors. The insurance was on the building as a whole, and not on any particular interest in it, and was accepted and treated by the mortgagee as an insurance complying with the terms of the mortgage, and covering all the interests which the mortgage covered.

The mortgagee could not, without the consent of the daughters, surrender the proceeds of the collateral security to Scammon, or divert them from the purpose to which the mortgage devoted them. And, in any event, the mortgagee, if at liberty to use the money toward restoring the building, was bound to see that it was so applied, and took the risk of the diversion. The money not having been so applied, it must be credited in favor of the daughters. Their intention, declared by the mortgage, that the money should be credited on the mortgage, was never varied by them.

Three persons named Andrews, and the wives of two of

them, were defendants to the bill. It alleged that they had interests in the mortgaged lot subordinate to the lien of the mortgage. They answered the bill, setting up a prior lien in favor of the three, because they had erected a party wall on and along the north line of the lot, under a party-wall agreement made prior to the mortgage, and of which the mortgagee at all times had notice; and alleging that, if the mortgage was superior in lien, then the residue of the lot, not covered by the party wall, should be first sold to satisfy the mortgage. Issue was joined on the answer. In the taking of proofs, the plaintiff put in evidence a party-wall agreement made June 4, 1866, between Scammon and one Smith, by which it appears that Smith owned lot 4, next north of lot 5, and gave permission to Scammon to build one-half of the north wall of a building he was to erect on lot 5, to the northward of the dividing line between the two lots, and that Smith, on paying to Scammon one-half of the value of the wall, was to be entitled to use the north half of it as a party wall. On the 25th of February, 1867, Scammon and his daughters and Smith executed a supplemental paper, stating that the contemplated wall had been erected, and agreeing that such wall was to be considered as built on the dividing line between lots 4 and 5, and that the centre of such wall was such dividing line. There is not, in the record, any other testimony about any party wall or the strip of land, and none to support the Andrews answer, and there is no mention of the strip in either of the reports of the master. The decree, however, finds that the three Andrews defendants own in fee, subject to the lien of the mortgage, by title derived from Scammon and his two daughters, the strip of land before referred to, describing it as a strip from off the north side of lot 5, 6⅝ inches wide in front, and 9¾ inches in the rear, and the depth of the lot. It also excepts that strip in declaring that the mortgage is a first lien on the life estate of Scammon in the north two-thirds of the lot, and in declaring that it is a first lien on the estate in remainder of the daughters therein, and declares that the $12,678.10 is a valid and first lien on that strip, and excepts the strip from the estate in remainder, and from the life estate, in describing the premises

to be sold, and directs it to be sold by itself, after those estates are sold.

The appellant objects to the adjudication in regard to the strip, on the ground that there is not in the record either pleading or evidence to support it. This is true. The decree must, therefore, be reversed in that respect. It is accordingly

*Affirmed, except as to the strip, and reversed as to that, and: the case is remanded to the Circuit Court, with a direction to strike out of the decree everything relating to the strip. The costs of the appeal are awarded to the daughters.*