**Key Credit Corporation, Plaintiff-Appellee, v. Kendall W. Young, Defendant-Appellant.**

**Gen. No. 54,208.**

First District, Fourth Division.

May 13, 1970.

Rehearing denied and opinion modified June 24, 1970.

Hubbard, Hubbard, O'Brien & Hall, of Chicago, for appellant.

Kenneth Baker and Edward M. Solomon, of Chicago, for appellee.

MR. JUSTICE DRUCKER delivered the opinion of the court.

This is a suit on a promissory note brought by plaintiff against the accommodation maker of the note, Kendall W. Young. At the close of all the evidence the court directed the jury to find in favor of plaintiff in the sum of $3,545.-57 and judgment was entered thereon. Defendant appeals from the judgment and from an order denying his motions for judgment notwithstanding the verdict and for a new trial.

On October 7, 1960, Robert Leray, defendant's brother-in-law, desired to secure a loan from plaintiff. Leray was indebted to defendant in the sum of $50 and asked defendant to go to plaintiff's office, located in Salt Lake City, Utah, where he was arranging for the loan. Leray promised to pay defendant the $50 from the proceeds of the loan. Ray Phillips, president of Key Credit (plaintiff) presented to defendant a note and chattel mortgage for defendant's signature. Defendant told Phillips that he was in no position to sign as security for anybody. However, Phillips told defendant that if he would sign the documents they would only serve as credit references for Leray. Phillips assured defendant he would never have to pay the note as plaintiff held in its possession sufficient collateral of Leray's to cover the note. Relying upon these promises defendant signed the note and chattel mortgage. Leray also signed both docu-

310

ments. The note was for $6,262.40, payable in 36 monthly installments of $173.95 each, commencing November 7, 1960.

Defendant's evidence shows that the collateral held by plaintiff consisted of 4,000 imported French dolls each worth between $3 to $25 according to the size and costume of the particular doll. Defendant's evidence further shows that in a letter dated December 7, 1962, to Bruce Jenkins, an attorney for plaintiff, Phillips stated:

"During the past year, I have spoken to you about this account. In August, Mr. Le Ray came to Salt Lake City and picked [sic] most all of his collerateral [sic]. The collateral was approximately 4,000 dolls. He told me that he had a sale for some of them for $1,000.00. Upon receiving this he would apply this to his and Mr. Young's account.

"He has never done this and today a $74,00 check he made in October bounced for the fourth time. In trying to determine the status of this account I tried to call Mr. Le Ray. His phone is disconnected.

"In the past I have written him many letters and placed numerous telephone calls to him in Los Angeles. All my efforts have failed. Mr. Young, Mission President, Taiti Mission, should be returning to Utah November 1963.

"Their complete file is enclosed in this letter. If we do not hear from them by December 20th, we hereby request that you bring immediate legal proceeding against Mr. Le Ray in Los Angeles and place the church on notice of your pending suit against President Young."

In a note to defendant, a copy of which Phillips had sent with the December 7, 1962, letter, Phillips also writes:

"President Young:

"I am sorry that this mess has to be discussed again. This time the balance due is $3,400 and 7 months delinquent.

"Today a $100.00 check he gave in November was returned the 3rd time.

"His wife told me that he was in San Francisco last week. Now the phone is disconnected.

"Whatever help you could give us in collecting the $1,200.00 he received on the sale of the dolls he took from our office, would be appreciated."

Therefore it is evident that in August 1962, when the collateral was released, the note had been in default for three months.

At the time of the signing of the note and chattel mortgage all parties concerned were residents of the State of Utah and the transaction took place in Utah. The parties agree on the applicability of Utah law.

Prior to the adoption of the Uniform Negotiable Instruments Law (hereinafter referred to as the "NIL") the release of collateral security held by the creditor operated to discharge an accommodation maker. See 11 Am Jur2d, § 957, and 2 ALR2d 261. The NIL contains no express provision dealing with the release of security. Therefore, as the NIL was adopted by the various states, there developed in the courts a difference of opinion as to whether or not an accommodation maker was discharged by a release of collateral security. 11 Am Jur2d, § 957. No Utah case directly on this point has been cited by either party.

Plaintiff argues that the defense of release of security is not applicable to defendant since defendant is primarily liable on the note.[1] Plaintiff cites Wolstenholme v.

---

[1] Utah Code Annotated, 1953, Vol 5, Title 44, § 44-1-30:

Liability of accommodation party.—An accommodation party is one who has signed the instrument as maker, drawer, ac-

Smith, 34 Utah 300, 97 P 329, in which suit was brought by plaintiff against an accommodation maker on a promissory note. The defense was that plaintiff extended the time of payment on the note without defendant's knowledge or consent and thereby discharged defendant. The court found that defendant was primarily liable on the note and therefore could not come within the specific statutory protection afforded by section 44–1–122 of the Utah Code Annotated, Vol 5, Title 44, which discharges only those secondarily liable on a note. Section 44–1–122(6) provides:

> "When persons secondarily liable on, discharged.
> —A person secondarily liable on the instrument is discharged:
> ". . .
> "(6) By any agreement binding upon the holder to extend the time of payment, or to postpone the holder's right to enforce the instrument, unless made with the assent of the party secondarily liable, or unless the right of recourse against such party is expressly waived."

Defendant argues, however, that this decision is not conclusive of his contention that the release of security collateral by plaintiff without defendant's knowledge or consent discharges him as accommodation maker on the note to the extent of the value of the collateral. Defendant cites Southern Nat. Life Realty Corp. v. People's Bank of Bardstown, 178 Ky 80, 198 SW 543, where the court discussed both an extension of time as a discharge of an accommodation maker and the release of security collateral effecting a discharge of an accommodation maker.

---

ceptor or indorser without receiving value therefor, and for the purpose of lending his name to some other person. Such a person is liable on the instrument to a holder for value, notwithstanding such holder at the time of taking the instrument knew him to be only an accommodation party.

In Southern the plaintiff, People's Bank, sued defendants, Southern National, M. K. Allen and John W. Ray, to enforce the collection of a note. Southern filed a separate answer which alleged its name was signed as surety and that it was not liable on the note. Defendants Allen and Ray in their separate answer alleged in the first paragraph that they were sureties on the note and that subsequent to the execution of the note the plaintiff, without their knowledge or consent, surrendered to the principal debtor on the note collateral securities which had been deposited with the bank to secure the note's payment.

The court found that although defendants Allen and Ray were primarily liable on the note, the defense of discharge from liability by reason of the release of the security was proper.

In its opinion the court discussed the Kentucky Negotiable Instruments Act, § 58, (Laws 1904, c 102), which is the same as section 44–1–59 of the Utah Code Annotated, Vol 5, Title 44.[2] The court at page 86 states:

> Unquestionably the Negotiable Instruments Act "covers the entire subject of negotiable instruments, and must be treated as a complete body of law upon that subject and controlling in all cases to which it is applicable," as said in the second Elsey opinion, but its provision in section 58 that "in the hands of any holder, other than a holder in due course, a negotiable instrument is subject to the same defenses as if it were nonnegotiable," is as much a part, and as potent, as any of its other provisions, except as modified by other provisions of the act itself. One such modification, sustained by the great weight of authority, is that an extension of time to the principal does not release a surety primarily liable, but

2 "In the hands of any holder other than a holder in due course a negotiable instrument is subject to the same defenses as if it were nonnegotiable."

does release one secondarily liable, allowed upon the ground that, the act having treated of releases for extensions of time, presumably all releases for that reason not specifically allowed were excluded; and this rule was approved and applied in First State Bank of Nortonville v. Williams, supra. But the act does not treat at all of collateral securities or of releases of sureties primarily liable by surrender of collateral securities, unless in section 58; and, as such release in nonnegotiable instruments was uniformly recognized when the statute was enacted, there can be no doubt it was the intention to preserve that defense among the original parties by section 58.

. . . . . .

The act does not lay down any new rule with reference to the effect, upon the liability of sureties to the original payee, of his surrender of collateral securities to the principal maker, or treat of collateral securities at all, but, upon the other hand, does specify that in the hands of a holder, such as we have seen plaintiff here was, a negotiable instrument shall be subject to the same defenses as if nonnegotiable.

. . . . . .

We therefore conclude the Negotiable Instruments Act has not changed or affected the defense set up in the first paragraph of the answer of defendants Allen and Ray.

See also Lawrence v. Hammond, 208 Ill App 31.

■ We, too, are of the opinion that by releasing the chattel mortgage property after default without the consent or knowledge of defendant, as accommodation maker, the plaintiff discharged the obligations of defendant under the note. We realize that some cases have inter-

315

preted the NIL differently. However, our holding is in conformity with both the common law existing prior to the adoption of the NIL and today's Uniform Commercial Code, which Utah adopted in 1966. (See Utah Code Annotated, 1953, Replacement, Vol 7B, Title 70A, § 3–606.) [3]

■ Plaintiff further argues that defendant consented, in effect, to Leray's possession of the collateral by executing a mortgage which stated that the mortgagors could retain possession of the mortgaged property. However, it is undisputed that plaintiff, the mortgagee, had possession when the mortgage was signed and retained possession thereafter until it voluntarily released the collateral to Leray after the mortgage was in default. We also note that the mortgage provided that in case of default the mortgagee would have the right to take possession of the collateral and sell it to satisfy the debt. Therefore, it is clear from a reading of both provisions that defendant's signature to the mortgage did not contemplate nor constitute consent to the release of the collateral *after* default.

■ ■ Although we have found that the release of collateral after default discharged defendant, such discharge is not necessarily complete; it is effective only to the extent that the accommodation maker has been injured. State Nat. Bank of Frankfort v. Thompson, 277 Ky 527, 126 SW2d 412 and 2 ALR2d 269, § 3. In the instant case defendant testified that plaintiff held approximately 4,000 imported French dolls at the time

---

[3] 70A–3–606. Impairment of recourse or of collateral.—(1) The holder discharges any party to the instrument to the extent that without such party's consent the holder

. . . . . .

(b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse.

he signed as accommodation maker in 1960. Defendant further testified that he had seen similar dolls in the Utah area priced from $3 to $25 each, according to the size and costume of the particular doll. Defendant's testimony as to the value of the dolls was uncontradicted and unimpeached. Therefore, we can only conclude from the evidence that defendant should be discharged in full from any obligation on the promissory note.

The judgment is reversed and remanded with directions to enter judgment for defendant.

Reversed and remanded with directions.

STAMOS, P. J. and ENGLISH, J., concur.