GODFREY STATE BANK, Plaintiff and Counterdefendant-Appellant, *v.* GINA R. MUNDY, Defendant and Counterplaintiff-Appellee.—(SMALL BUSINESS ADMINISTRATION, Plaintiff-Appellant; JERSEY SAVINGS & LOAN, Defendant.)

Fourth District No. 16031

Opinion filed November 12, 1980.

Suddes, Davis & Wittman, of Jerseyville, for appellant.

Robert E. Ryan, of Alton, for appellee.

Mr. PRESIDING JUSTICE MILLS delivered the opinion of the court:

This case centers on interpretation of the Uniform Commercial Code, particularly section 3—415 and section 3—606.

On April 26, 1977, a complaint was filed alleging that defendant and her former husband, Benton I. Mundy, entered into a mortgage with the Godfrey State Bank dated June 1, 1973. The complaint further asserted

that the amount of the original indebtedness was $85,000 and that the total amount due on April 20, 1977, was $38,686.25, in both principal and interest. The bank's complaint also alleged that pursuant to a property settlement agreement entered into on June 7, 1973, defendant became the sole owner of the property in question and prayed for foreclosure of the mortgage in a deficiency judgment against the defendant.

On June 8, 1978, defendant filed an amended answer, affirmative defenses and a counterclaim. The amended affirmative defenses claimed that there was no consideration for defendant's signature and if defendant was liable at all, it was as an accommodation party. Defendant also alleged that the bank released the collateral without her knowledge or consent, thus constituting an impairment of collateral. In her counterclaim, she asserted that the mortgage was a cloud on her title and that she was entitled to have it removed.

In its reply, the bank denied that defendant was an accommodation party but admitted that as a result of damage done by fire to equipment in which plaintiff had a security interest, approximately $26,000 in insurance proceeds was used by Benton Mundy to replace the original equipment and that the bank took a security interest in the new equipment. Plaintiff bank also admitted that certain property was released from a mortgage on May 17, 1974. The bank further admitted loaning Benton Mundy $8,500 at a time when he was delinquent by $2,000 on the note and that there had been a modification in the payments on the $85,000 note.

Following a bench trial, the trial court entered a memorandum of decision finding that defendant was brought into the loan transaction only to lend security to loans made to Benton and was an accommodation party. The court also found that the conduct of the bank and its dealings with Benton were such as to release and discharge the defendant's obligations on the note. Additionally, the court found that there was a novation which discharged the defendant and that the bank fraudulently altered the terms of the instrument, thereby discharging the defendant from liability. A decree was filed on December 13, 1979, finding that defendant had proved all the material allegations of the amended affirmative defenses and amended counterclaim. The court discharged the obligations and removed the mortgage as a cloud on title.

We now affirm the trial court. And our disposition requires that we only address one issue.

Section 3—606 of the Uniform Commercial Code provides in part:

"(1) The holder discharges any party to the instrument to the extent that without such party's consent the holder

* * *

(b) unjustifiably impairs any collateral for the instrument given

by or on behalf of the party or any person against whom he has a right of recourse." Ill. Rev. Stat. 1979, ch. 26, par. 3—606(1)(b).

In *Wohlhuter v. St. Charles Lumber & Fuel Co.* (1975), 62 Ill. 2d 16, 338 N.E.2d 179, our supreme court noted that, on its face, section 3—606 would appear to apply to any party to the instrument. After reviewing the legislative history of that section, however, the court ruled that the term "any party" as used in section 3—606 was intended to include parties who sign ostensibly as makers but who are in fact surety or accommodation makers and the provisions of section 3—606 do not apply to co-makers.

### ACCOMMODATION PARTY

Thus, before this defendant can defend on the basis that the plaintiff bank has unjustifiably impaired collateral, she must establish her status as an accommodation party. To do this, she must show that she falls within the provisions of section 3—415 of the UCC, which provides:

"(1) An accommodation party is one who signs the instrument in any capacity for the purpose of lending his name to another party to it." (Ill. Rev. Stat. 1979, ch. 26, par. 3—415(1).)

In the instant case, the trial court found that defendant had proved both her accommodation status and that there had been an unjustified impairment of collateral.

■■ ■ An accommodation party is one who signs in any capacity, including that of a maker, for purposes of lending his name to another party generally. Whether he is an accommodation party at the time of signing is a question of fact and intention, and, once his status as a maker has been affirmatively established, it is not subject to change. *Wohlhuter v. St. Charles Lumber & Fuel Co.* (1975), 25 Ill. App. 3d 812, 323 N.E.2d 134, *aff'd* (1975), 62 Ill. 2d 16, 338 N.E.2d 179.

The bank here claims that the defendant was not an accommodation party and raises a number of points in support of its position. Initially, the bank notes that the defendant signed the note in the lower right-hand corner where makers normally sign and thus reasons that she was a maker rather than an accommodation party. As we have noted above, however, an accommodation party can include one who signs as a maker.

In ruling that the defendant was an accommodation party, the trial court looked at the fact that the bank knew of the impending divorce and long-term separation of the Mundys prior to making the loan and that it ignored the defendant after the loan was made. The court also looked at the fact that the documents introduced into evidence left defendant's capacity in doubt since she was sometimes referred to as co-owner, wife or spouse, applicant or borrower. The bank now argues—without citation of authority—that the defendant was an accommodation party, if at all, at the time she signed the note and that all evidence subsequent to the actual

signing was not relevant. Since the defendant's status was not disclosed by the loan documents, however, we find that "* * * evidence of the practical construction given to the instrument of writing by the parties thereto may be admissible to explain its meaning when the explanation is necessary." (32A C.J.S. *Evidence* §960(d), at 416 (1964).) This evidence was properly considered by the trial court.

In the Second District's opinion in *Wohlhuter*, no accommodation party status was found where the defendants were the owners of all the outstanding shares of capital stock of the company and also its officers and directors. The note was signed by the corporation and by the defendants and it contained a provision that all signers of the note were principals. The court found that they were principals due to their interest in the corporation, the fact that the loan was important to the preservation of that interest, the note was signed in both their individual and corporate capacities, and they later requested release of their individual and personal liability on the note. Thus, defendant correctly responds to the bank's contention since in *Wohlhuter* the court looked at action subsequent to the execution of the note in deciding the status of the parties.

The bank next strenuously argues that defendant received a direct benefit from the proceeds of the $85,000 note and that this precludes her from occupying the status of an accommodation party. A review of the creditor-debtor relationship that existed over a period of years between the bank, the defendant and defendant's ex-husband is necessary to understand the bank's argument. Between July 1970 and June 1973, the date of the execution of the note, plaintiff made 23 loans to Benton Mundy. Apparently, defendant's first involvement with the bank was in 1967 when she signed a loan guarantee agreement to enable her husband to borrow from plaintiff up to the amount of $8,484.48. Prior to November 21, 1972, defendant was not a party to any of the loans. On that date, a note for $28,842 and a security agreement were signed by defendant and her husband. None of the prior loans had been secured by real estate, but defendant was brought into the picture because she was half owner of the real estate the bank desired as security.

When the November 1972 loan was made, defendant's husband was indebted to the bank in the amount of $16,000 and needed additional cash. The $16,000 was covered by the guarantee defendant had signed in 1967, and the debt was retired with the proceeds of the $28,000 loan. At one point, plaintiff's executive vice president said he could not state if any of the $9,000 cash advance went to the benefit of defendant. At another point, he testified that $9,000 went into an account on which defendant wrote checks. Defendant, however, testified that she did not write checks on the Alton account but on a Jerseyville account which she maintained.

In June of 1973, the note involved in this case was executed by

defendant and her husband. Defendant took no part in the negotiations prior to the execution of this note, nor, apparently, in those leading to the execution of any other notes by her ex-husband. This note was for $85,000, and numerous documents were submitted to the Small Business Administration for this loan. The SBA documents referred to Benton Mundy as 100% owner of the business and were not signed by the defendant. When this note was signed, defendant and her husband had been living apart for two years with the bank's knowledge. At trial, defendant's ex-husband testified that he told the bank that a divorce was imminent and he was told not to make "waves." Defendant and her husband were divorced approximately one week after the note was signed.

The proceeds of the $85,000 loan were distributed in various ways, including: $40,000 to retire existing indebtedness, which included the $28,000 note defendant signed in 1972; $25,000 to pay for equipment, the bill of sale for which was made out to "Benton Mundy and _____ Mundy, husband and wife." Defendant did not sign any of the documents involved in this sale; and, almost $20,000 was deposited in a joint account of the defendant and her ex-husband. The evidence indicates, however, that the defendant did not write checks on this account.

The bank argues that this evidence showed that defendant directly benefited from the $85,000 loan and therefore could not be found to be an accommodation party. Plaintiff contends defendant benefited because part of the proceeds discharged the November 1972 note which was signed by defendant and because part of the proceeds went into a bank account that defendant was a signator to and therefore *could have* drawn on. Moreover, the bank contends that defendant benefited because the bill of sale on the equipment was made out to "Benton Mundy and _____ Mundy, husband and wife."

Plaintiff bank also cites the fact that defendant had an interest in the marital assets and the financial well-being of her husband both before and after divorce. Even though the bank may have known a divorce was imminent, it contends that the parties still had an intertwining business interest. The bank argues that a lender is not required to police the proceeds of a loan in order to insure that a maker is not an accommodation party.

The intention of the parties is the significant element in determining whether the party is an accommodation maker. If the intent is not expressed, the purpose for which the instrument was executed or used is a significant element. When a person receives no "direct benefit" from the execution of the paper, it is likely he will be regarded as an accommodation party but not if he received such a benefit. (2 Anderson, Uniform Commercial Code §3—415:9, at 1002-03 (1971).) Since receipt of the proceeds from the instrument, or other direct benefit, would usually be

inconsistent with accommodation status, that aspect is focused on by the courts. "Thus if father and son sign a note for the purchase of a truck and both use it in a partnership business, the father is not simply 'lending his name' to the son but is getting a more direct benefit * * *." White & Summers, Handbook of the Law Under the Uniform Commercial Code §13—13, at 521 (2d ed. 1980).

■■ We believe the evidence shows that defendant was an accommodation party. First, we note that her initial participation in 1967 was as a guarantor (an accommodation status) and this status continued. Defendant did not participate in any of the discussions before the execution of this note, and only signed the 1972 note because the bank desired additional security. Furthermore, the only modification of the payments on the $85,000 note was made in the following manner:

"Central Illinois School of Beauty

Benton I. Mundy,
individually and d/b/a

Gina R. Mundy,
his wife."

A subsequent modification was signed by the husband only.

Accommodation status is also supported since defendant drew no checks on the Alton account and did not see any checks on that account with her name on them. Defendant signed the November 1972 note as an accommodation party, and the fact that it was discharged by this note did not change that status. Defendant had no joint interest in this loan, and her husband was listed as a 100% owner of the business.

Defendant correctly relies on *South Side Bank & Trust Co. v. Yorke* (1973), 15 Ill. App. 3d 948, 305 N.E.2d 367. There, a loan was made to American Plumbing Supply Company, a partnership, which was owned by two brothers, Samuel and Joseph Kaplan. The note evidencing the loan was executed by American and also by the partners individually, their wives, and their father. The evidence showed that Samuel had applied for an unsecured loan which was refused. On behalf of American, he then offered the lender the beneficial interest in two land trusts as collateral to secure the loan. One of the trusts was owned by Samuel, Joseph, and their wives. The other was owned by the father. After receiving the assignment of the beneficial interest, the lender made the

loan to the partnership. Several years later, a renewal note was executed and signed by the five Kaplans and by the partnership. The proceeds of the loan were paid to the partnership only, and none of the proceeds were received by the Kaplans individually. Neither the father nor the wives had an interest in the partnership. The trial judge concluded that the five Kaplans were co-makers and not accommodation parties because it was a family loan and the Kaplans received value and benefit. The appellate court disagreed and found that the Kaplans were accommodation sureties who were lending their personal credit to the partnership.

Although not cited by the parties, a number of cases do deal with the question of whether a wife could occupy the status of an accommodation party.

In *Seaboard Finance Co. v. Dorman* (1966), 4 Conn. Cir. 154, 227 A.2d 441, a husband was interested in photography and was negotiating with the finance company to purchase equipment and training. He and his wife went to the finance company and executed a note as makers. In the presence of the wife, a check was issued by the company payable to the husband. Suit was brought to recover on the note, and the defendants asserted lack of consideration in the trial court. The wife claimed she received no consideration from the company for signing the note, but that she only lent her name to her husband. The trial court found she was an accommodation maker and thus liable on the note. On appeal, the court affirmed, noting that the consideration supporting the promise to pay was that flowing to her husband. Want of consideration is one of the peculiar characteristics of accommodation paper. The court concluded that no error occurred in finding that the wife was an accommodation maker. See also *Riegler v. Riegler* (1968), 244 Ark. 483, 426 S.W.2d 789.

Our search has also unearthed an Illinois case on this point. In *Cissna Park State Bank v. Johnson* (1974), 21 Ill. App. 3d 445, 315 N.E.2d 675, this court decided that a wife was an accommodation party. The evidence showed that Gerald Johnson had acquired loans from a bank over a period of years winding up in a note for $50,000. A second note was originally executed by his father to cover checks originally written by Gerald. Thirty days after the notes were signed, Ruby Johnson, Gerald's mother, was called to the bank and asked to sign both notes. At the time of the original execution of the notes, no agreement was made that she would be asked to sign and no new consideration passed to her at the time she signed. According to a bank officer, the reason her signature was requested was because her husband was in failing health and the bank learned that most of their property was in joint tenancy. The trial court found the mother was an accommodation party, liable on the note and therefore consideration for her signature was not required. We affirmed that finding.

Consequently, we hold that the trial court in the instant case properly concluded that the defendant was an accommodation party. The evidence supports the conclusion that she signed this note only to lend her name to the husband. Plaintiff's own vice president testified that defendant's signature was on the 1972 loan so the bank could have security it felt was necessary. Therefore, defendant was accommodation party to that instrument and the signing of the note involved in this case did not change that status. The evidence supports the conclusion that defendant's signature was only desired so that the realty could be used as security, and defendant was ignored in all other respects. The trial court's decision is not against the manifest weight of the evidence.

## UNJUSTIFIABLY IMPAIRED COLLATERAL

■■ Having decided that defendant was an accommodation party, we now come to consider whether the bank "unjustifiably impaired collateral."

Plaintiff bank contends that it did not unjustifiably impair the collateral. The critical event is the fire which occurred at the business in Alton in January of 1974. Without consultation with the defendant, the bank and defendant's ex-husband negotiated distribution of the insurance proceeds which the debtor had been required to maintain on the premises. The exact distribution of the proceeds is not clear. The bank wrote a letter to the SBA indicating that $95,000 was to be paid by the insurance company. Of that amount, $33,000 was to be used to pay off a first mortgage on the premises, $27,000 to purchase new equipment, and $30,967 was to be paid on the $85,000 note. This letter also states that the property was worth $10,000.

The distribution mentioned in the letter leaves an additional $4,000 unaccounted for. Adding this $4,000 to the $27,000 which was used to purchase equipment equals $31,000 that apparently was used by defendant's husband with the bank's permission. Furthermore, the bank's vice president testified that Benton Mundy had approximately $31,000 credited to his account out of the insurance proceeds. In May of 1974, the bank released the mortgage on the property in Alton so that it could be used as security on an $8,500 loan to Benton Mundy.

Defendant correctly contends that the bank unjustifiably impaired collateral by releasing the $31,000 of insurance proceeds to Benton Mundy and releasing the mortgage on the property which plaintiff stated had a value of $10,000, without defendant's consent. In *Connecticut Mutual Life Insurance Co. v. Scammon* (1886), 117 U.S. 634, 29 L. Ed. 1007, 6 S. Ct. 889, a father and his two daughters owned undivided interests in certain real estate which was mortgaged by them to secure payment of a loan. The mortgage contained a clause requiring the owner

to fully insure the premises. Subsequent to the mortgage there was a partition of the real estate by agreement of the parties. The father then erected a building on a portion of the land subject to his life estate, but this building was later destroyed by fire and the company issued a draft payable to the mortgagee. The mortgagee then entered into an agreement with the father waiving his right to apply the insurance proceeds to the indebtedness and allowing the father to erect a new building on the mortgaged premises. The daughters had no knowledge or information as to the transaction between their father and the mortgagee, and no new building was ever constructed. The mortgagee later attempted to foreclose on the mortgage, and the daughters defended on the basis that the mortgagee, in consenting to use the insurance proceeds in a way other than payment on the mortgage indebtedness, released the property of the daughters to that extent. The Supreme Court agreed.

Additionally, in *Fergus v. Wilmarth* (1886), 117 Ill. 542, 7 N.E. 508, the court held that a trustee under a deed of trust, where he is a payee of a policy of insurance on the buildings on the real estate covered by the trust, holds the proceeds of the policy as a security of the debt. And, the mortgagee in possession of the proceeds of an insurance policy which must be applied to the payment of the mortgaged debt stands in the relation of a trustee for the mortgagor. (55 Am. Jur. 2d *Mortgages* §274, at 363 (1971).) Another case of interest is *Key Credit Corp. v. Young* (1970), 124 Ill. App. 2d 309, 260 N.E.2d 488, which involved a suit on a promissory note against an accommodation maker. The court, applying Utah law, concluded that under the UCC the release of chattel mortgage property after default without the consent or knowledge of an accommodation maker discharged the obligation of the accommodation maker to the extent he had been injured.

Defendant correctly contends that the bank had a duty to hold and apply the insurance proceeds received by it to the debt which the destroyed assets secured and not to release the mortgage unless the defendant's consent was obtained. Not only was collateral impaired but it was, in fact, *extinguished* by the bank's actions. Plaintiff's actions were not justified without defendant's consent. In fact, plaintiff's executive vice president testified that he did not know either the quality or quantity of replacement items or how they had been purchased.

The bank also argues (without citation to authority) that it did not unjustifiably impair the collateral because if it had not released the collateral, Benton Mundy could not continue in business and would become bankrupt. Plaintiff argues that it was acting in good faith in trying to protect collateral and did not callously disregard defendant's right. Moreover, the bank argues that it had a security interest in the new equipment purchased with the insurance proceeds.

The cases support the conclusion that the insurance proceeds represented the assets pledged or mortgaged to secure the debt. The evidence shows the bank held or controlled these proceeds as a trustee for defendant and yet released them to defendant's ex-husband without insuring their application or obtaining defendant's consent. While the bank's motive may have been pure, its conduct has injured defendant. Since the bank apparently felt that Benton Mundy would not default or go bankrupt, the bank took the risk and should not be allowed to now turn to defendant after the bank's business judgment proved to be wrong.

Finally, plaintiff bank argues that even if the collateral was unjustifiably impaired, it did not totally discharge the defendant. On the date of trial, August of 1979, the principal due on the note was $35,796, and a sum of $9,000 was due as interest for a total of $44,796. No payment is, however, due because the defendant was discharged in the amount of $41,000 in 1974. (This was comprised by $31,000 in insurance proceeds and $10,000 due to the release of the mortgage.)

Having found that the trial court correctly determined that the defendant was only an accommodation party and that the bank unjustifiably impaired collateral so as to release her obligation, we do not address the other arguments of the trial court which are presented as alternative grounds for affirming.

Affirmed.

CRAVEN and WEBBER, JJ., concur.